Ben F. CARLISLE and Grace Carlisle, Appellants,

v.

Charles W. KEELING, Respondent.

No. 47648.

Supreme Court of Missouri, Division No. 2.

June 12, 1961.

Albert Thomson, Robert W. Cook, Al Lebrecht, Kansas City, for appellants. Davis, Thomson, VanDyke, Fairchild & Walsh, Kansas City, of Counsel.

Thomas M. Sullivan, Downey, Abrams & Sullivan, Kansas City, for respondent.

LEEDY, Presiding Judge.

Action between the owners of adjoining city lots to determine title to a strip 15 feet in width along the common boundary of their properties. Plaintiffs claim title by adverse possession. The trial court found against such claim, and awarded judgment to the defendant, the record owner, from which judgment plaintiffs have appealed.

The property in dispute is the north 15 feet of Lot 25, Block 1, King and Bouton's Addition in Kansas City, Missouri. Defendant is the record owner of all of said Lot 25 (and one-half of adjacent Lot 24, which is not here in controversy). Lot 25 lies immediately south of plaintiffs' premises, to wit, Lot 26 (and the adjacent south 3 feet of Lot 27, lying to the north of Lot 26). All the lots in the block are 26 feet wide and 120 feet deep, as shown by the recorded plat. Those of plaintiffs and defendant front on Washington (a north and south street), and are bounded on the east by an alley running north from 17th Street. The neighborhood is decadent and run down. The dwellings are quite small in size—"tiny," as one witness expressed it. Defendant's property is unimproved, vacant ground, whereas plaintiffs reside in the dwelling located on their Lot 26. A survey made at the instance of defendant disclosed that plaintiffs' residence was "somewhere between a foot and a half and two feet" north of the north line of the strip in question. There is a door on the lower or semibasement level at the south side of plaintiffs' residence which gave access to the disputed strip simply by crossing over the smaller foot and a half or two foot strip mentioned above. The elevation of the western portion of the disputed strip is lower than the rest of the lot, and lower than the street level. There is either a low retaining wall or the remnants of a masonry foundation which extends eastward for an undisclosed distance from the front or west line of the lot. It is with respect to the area between this retaining wall or foundation and plaintiffs' residence to the north thereof (sometimes referred to by

plaintiffs' witness as a side yard) that most of the proof was directed.

Plaintiffs acquired an undivided one-half interest in the premises known as 1655 Washington Street (being all of Lot 26, and 3 feet of Lot 27 above mentioned) by warranty deed dated February 11, 1946, the co-owners being Mrs. Carlisle's son, Lawrence V. Hall and his wife. The latter lived with plaintiffs at this Washington Street address from February 1946 until August 1947, at which time they moved to Texas and conveyed their one-half interest to plaintiffs by warranty deed. They returned in 1950, again moved in with plaintiffs, and lived with them until 1954.

This controversy arose in 1957 when defendant, through a real estate agency, sought to purchase the property owned by plaintiffs together with the property immediately to the south thereof, including the strip in question (which he did later acquire). Defendant owns an apartment building located on the west side of Broadway, the next street east of Washington. Plaintiffs' property and the adjoining lot on the south are adjacent and to the rear of this apartment building, and defendant de-, sired to purchase those properties for use as a parking lot for the tenants in his apartment building. The negotiations were handled by Mr. Sewell W. Mudge, Vice President of John A. Moore & Co., who contacted plaintiff, Ben Carlisle, on two or three occasions early in 1957 in attempting (unsuccessfully) to purchase plaintiffs' property. He did, however, negotiate a sale to defendant of the property to the south of plaintiffs', the owner of which was a nonresident, Mr. Gustafson, who lived in the State of Washington. The deed from Gustafson to defendant was dated June 19, 1957, and it conveyed the north half of Lot 24, and all of Lot 25.

Plaintiffs' evidence was to this effect: That a former tenant (not owner) pointed out the retaining wall to the husband, Ben Carlisle, as being the south boundary of the property (inferentially at the time of pur-chase in February 1946), thus including the strip in question; that (at some unspecified time) two trees thereon had died out, and Mrs. Carlisle replaced them by planting two others in their stead, which replacements, as shown by photographs, appear to be in very close proximity to the north side of the retaining wall; that Ben customarily parked his car in the disputed area; that old wooden clothesline poles were on the strip when plaintiffs moved in, which at some unspecified later time they removed, and replaced with new metal poles—these (two in number) appear to set somewhat to the south of the center of the strip, one being at the west end and the other aligned perhaps with the east end of the house (whether set in concrete or merely forced into the ground does not appear); that here the women hung out their wash to dry, and the same area, sometimes referred to as a side yard, was also used, particularly in the summertime, as a play area for the children, and where picnics were held; that Mrs. Carlisle planted flowers along the retaining wall, and that plaintiffs kept the grass mowed. There was evidence to the effect that at the time plaintiffs moved into the house there were two small structures which were *partly* on the strip in question—one was a coal shed "directly back of the house and to the south," which plaintiffs tore down without asking anybody's permission; the other building was "considered a tool shed." It was removed, with plaintiffs' consent, by "a lady that lived in the building, and claimed it was her husband's, and she wanted it, so we let her take it, or I did." The basis of the woman's claim was not disclosed.

The foregoing facts have been gleaned from the testimony of Mr. and Mrs. Carlisle and Mrs. Carlisle's son, Hall. The other (and apparently the only disinterested) witness called by plaintiffs was a neighborhood grocer, a long-time resident of the neighborhood, who stated that for "several years" that he knew of, Ben Carlisle had parked his Hudson automobile "off the street," and on a portion of the side yard

near the porch; that there was "clotheslines in back there, and there was a little walk through there"; that the people who had lived there before the Carlisles used the side yard as their own, but he expressly disclaimed knowing whether those previous occupants owned or claimed to own the property.

Ben Carlisle admitted that plaintiffs had not paid taxes on the disputed tract nor contacted the tax authorities with respect to having the taxes thereon assessed against them. He further testified that at the time he received his deed he had no knowledge of what it gave him; that, in fact, the line called for by his deed had been pointed out to him only a few days before the trial. He mistakenly believed it to include the area in controversy, as pointed out to him by the previous tenant. He admitted that although he had had the abstract of the property for four or five years, he had never looked at it until the present controversy arose. (The abstract was in evidence, and it shows plaintiffs were the record owners of 29 feet of ground.)

At the trial plaintiffs abandoned claim to that part of the strip at the southeast corner thereof which admittedly had been used by one Shaller for, as we understand, parking and incinerator purposes. This voluntary abandonment was because plaintiffs' possession of that portion (dimensions not shown) was admittedly not exclusive.

The survey heretofore referred to was ordered June 4, 1957, and within a week or two thereafter, following its completion, defendant's agent, Mudge, went upon the premises and was "checking the marker point in the sidewalk and the stick at the other corner" as laid out in accordance with the survey, when Ben Carlisle appeared, and, according to Mudge, they "exchanged more or less friendly conversation about it. He [Carlisle] said he didn't realize it was that close to his home, but at that time didn't raise any particular objection to it other than being surprised." At that time Carlisle did not say anything, or make any claim that he owned the strip. The first Mudge heard of any such claim was late in July or early in August 1957, when Carlisle called and told him to stop the workmen (employes of a contractor employed on behalf of defendant to build a retaining wall along the north boundary of the strip) from coming about his property.

Defendant's own testimony showed he secured a warranty deed to the parcels (including the strip) conveyed to him by Mr. Gustafson, such deed being dated June 19, 1957; that he paid cash for the property, and since that time he has paid the taxes on it. Before the present action was filed, no one had ever made a claim to him or in his presence of owning any portion of the property. In accordance with the survey, he ordered posts put in to mark the east and west lines of the property. These posts were dug up by someone unknown, and defendant then put up a sign which was likewise torn down. At the times when he went on the premises with a view of buying the same, "everybody seemed to be using it" for parking cars, and an incinerator was being used by the neighborhood, including the janitor of his (defendant's) apartment.

Appellants complain that the judgment was erroneously entered because their evidence established and proved without dispute all the elements necessary to acquire title by adverse possession. Countering, respondent says that plaintiffs' evidence was disputed, and was not so clear and convincing as to require belief—in other words (as in the very recent case of Bach v. Standard Oil Co., Mo., 345 S.W.2d 144), that plaintiffs' evidence of adverse possession and hence of title is not manifestly compelling, wherefore the judgment should be affirmed.

█ The principles of law governing the issue upon which this case turns are conceded; that is, the elements requisite to establish title by adverse possession are these: "(1) That the possession must be hostile; that is, under a claim of right;

(2) actual; (3) open and notorious; (4) exclusive; and (5) continuous. The burden of proof as to each of these elements is upon the person asserting title through adverse possession." State ex rel. Edie v. Shain, 348 Mo. 119, 152 S.W.2d 174, 176; Bell v. Barrett, Mo., 76 S.W.2d 394, 397. The question then becomes simply that of the effect of the proofs adduced, pro and con. This being a court-tried case, it is to be reviewed "upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Sup.Ct. Rule 73.01(d), V.A.M.R. And, under the record in this case, it is this court's ultimate duty to "reverse or affirm the judgment or order of the trial court, or give such judgment as such court ought to have given, as to the appellate court shall seem agreeable to law." Sup.Ct. Rule 83.13 (c), V.A.M.R. So the fact that plaintiffs' evidence, if believed by the trial court, would have made out a prima facie case is, therefore, not determinative on this appeal.

■ Appellants point to certain cases which they say are analogous and support their contention, such as Morrow et al. v. Elmore et al., Mo., 234 S.W.2d 613, and Sanderson v. McManus, Mo., 252 S.W.2d 351, among others. We do not pause to recite their facts because they are not comparable to those in the case at bar. For instance, in both of the cases just mentioned it appeared that a structure (the residence of the prevailing party) extended across the true line, and over the disputed strip for the prescribed period. The situation here presented is that the ten-year limitation period (Section 516.010 RSMo and V.A.M.S.), under the most favorable view of plaintiffs' evidence, had run only shortly more than one year prior to the filing of this suit. It is by no means clear or conclusive from plaintiffs' evidence as to the hostile nature of their possession of the strip that it began or was evident from the inception of their occupancy of the

dwelling. The court might well have concluded that, the residence of the record owner in a far distant state considered, such use as plaintiffs made of the premises ripened into a claim of ownership only by reason of gradual, unrebuffed intrusions upon the premises and rights of the record owner. It would be difficult to believe that one with a deed to 29 feet of city property would, under the circumstances of this record, from the very moment of taking possession, make claim to a 44-foot area. In this view of the matter (which renders unnecessary discussion of other cases cited by appellants, none of which are urged as controlling), we are of the opinion that the trial court was fully warranted in entering the judgment it did, and it is, therefore, affirmed.

All concur.