Lawrence V. TESON, David Behle, Nancy Behle, Joseph Harry Keeven, Mary Catherine Keeven, Matthew Klaus, Florence Klaus, Charles Sommers and Margaret Sommers, Plaintiffs-Respondents,

v.

Velma VASQUEZ, Executrix of the Estate of Leo Vasquez and Velma Vasquez, Defendants-Appellants.

Nos. 37003, 37004, 37506, 37608 and 37609.

Missouri Court of Appeals, St. Louis District, Division Three.

Dec. 27, 1977.

Edward D. Weakley, Lashly, Caruthers, Thies, Rava & Hamel, St. Louis, for defendants-appellants.

Marvin M. Klamen, Klamen, Summers & Compton, Clayton, for plaintiffs-respondents.

GUNN, Presiding Judge.

This is a consolidated cross appeal from judgments of the circuit court, sitting without a jury, quieting title to certain tracts of land located in St. Louis County in claimants, Teson, Sommers, Keeven and Behle, by adverse possession and quieting title to other tracts in defendants Vasquez under their quitclaim deed. Defendants argue on appeal that the elements of adverse possession were not established by the claimants in whom title was quieted. Claimants,

Klaus and Teson, who were found not to have established title by adverse possession, appeal from the court's finding, arguing that they proved their title under that theory.

We affirm in part and reverse in part.

Claimant, Lawrence Teson, commenced this suit on August 25, 1969, by filing a petition in the circuit court seeking to have title to certain lands near his home quieted in favor of himself and his wife. Defendants, Leo and Velma Vasquez,[1] then filed a motion to make more definite and certain. No further action was taken until December 8, 1972, when Teson, with leave of court, filed a first amended petition seeking to quiet title to the same tract of land by adverse possession. Claimants, Keeven, Behle, Klaus and Sommers, who claimed title to nearby and adjoining lands by adverse possession, were added as parties plaintiff.[2] Defendant's answer, filed March 30, 1973, was a general denial. In their counterclaim, defendants alleged that they were conveyed good title to the entire property in question by a quitclaim deed from Hugo and Alvina Essen on October 2, 1950 and prayed that title be quieted in them on the basis of this recorded deed.[3] Prior to trial defendants' motion to separate was sustained, and each claimant's suit was ordered to be tried separately but seriatim. The Teson and Sommers cases were so tried. Because of the confusion and repetition of evidence encountered in those cases, the Keeven-Behle and Klaus cases were tried together.

The property in controversy consists of approximately 208 acres of rich river bottom land in northeast St. Louis County. It is bounded on the north by the Missouri River and on the south by Aubuchon Road. The eastern and western boundaries are not marked by any distinct landmarks but are merely prolongations of United States survey lines from their endpoint at Aubuchon Road extending to the Missouri River. The four parcels claimed by adverse possession are shaped roughly as rectangles, and each is bounded by Aubuchon Road, the river and the prolongations of the United States survey lines. Title to a 92 acre parcel situated between the Teson and Klaus tracts was quieted in defendants in *Baxter v. Vasquez*, 501 S.W.2d 201 (Mo.App.1973).[4] This suit concerns the title to the remaining 208 acres purportedly conveyed to defendants by the Essens under the 1950 quitclaim deed. The following generally depicts the location of the property involved:

[See following illustration.]

---

1. Subsequent to trial but prior to this appeal Leo Vasquez died. Velma Vasquez, as the executrix of his estate, was substituted as a party.

2. In addition to their prayer to quiet title each claimant sought money damages from defendants for slander of title. These claims for money damages were abandoned at trial.

3. In their counterclaim, defendants disclaimed ownership to certain property lying between Aubuchon Road and Cowmire Creek, even though it was within the tract described by the deed from the Essens because it was found to have been erroneously included.

4. The Keeven-Behle tract is separated from the Sommers tract by a large parcel of farmland which at the time of trial belonged to St. Stanislaus Seminary. Defendants do not claim any title to this land.

N

146

Mo.

147

148

149

150

154

155

156

TESON

BAXTER

v

VASQUEZ

RIVER

KLAUS

KEEVEN-BEHLE

ST STANISLAUS SEMINARY

SOMMERS

COLDWATER CREEK

AUBUCHON ROAD

The land in controversy, though it is rich farmland today, was not always so. In the mid 1800's when the area was first surveyed and platted this land was an island in the middle of the Missouri River. The St. Louis County bank of the river was located at what is now called Cowmire Creek near Aubuchon Road. Over the last century and one half, the river channel slowly shifted northward until the former island became attached to the St. Louis County riverbank. Even after it became part of the mainland early in this century, almost none of the land was suitable for farming because of the low-lying swampy character of the land, the dense growth of timber, brush and vines and the frequent flooding. In 1950 when the Essens conveyed this property to defendants, it remained largely a vast wasteland of little value.[5] Since that time many improvements have taken place increasing the worth of the land. One or more levees have been constructed which have lessened, though not eliminated, the flooding problems, and which have decreased the acreage covered by swamps. Additionally, the land was cleared of floodplain vegetation. This clearing occurred slowly and sporadically in the 1950's, but its pace quickened appreciably in the early 1960's and has continued until the present. Today the vast majority of the land is suitable for farming. There remain, however, a number of low-lying sloughs crisscrossing the property as well as the free-flowing Cowmire Creek.

■ Before detailing and examining claimant's acts of possession which allegedly vested title in them to the land in controversy, we indite the well settled precepts of the law of adverse possession. The claimant has the burden of proving by the preponderance of the evidence the existence for the entire statutory period of each and every element of adverse possession. He must show actual, hostile, i. e., under a claim of right, open and notorious, exclusive and continuous possession of the property for ten years. Failure to prove any one element prevents the ripening of title by adverse possession. § 516.010 RSMo 1969. *Conran v. Girvin*, 341 S.W.2d 75 (Mo. banc 1960); *Walker v. Walker*, 509 S.W.2d 102 (Mo.1974); *Wilton Boat Club v. Hazell*, 502 S.W.2d 273 (Mo.1973); *Moran v. Roaring River Dev. Co.*, 461 S.W.2d 822 (Mo.1970); *Wykle v. Colombo*, 457 S.W.2d 695 (Mo. 1970); *Miller v. Warner*, 433 S.W.2d 259 (Mo.1968); *Carlisle v. Keeling*, 347 S.W.2d 191 (Mo.1961); *Hamburg Realty Co. v. Walker*, 327 S.W.2d 155 (Mo.1959); *Feinstein v. McGuire*, 297 S.W.2d 513 (Mo.1957); *Horton v. Gentry*, 357 Mo. 694, 210 S.W.2d 72 (1948).

■ In dealing with a case of adverse possession, it must be remembered that we are presented with mixed questions of law and fact in which the application of the facts to the law presents the major issues of controversy. See *Moss v. James*, 411 S.W.2d 104 (Mo.1967). Moreover, our task is further complicated by the fact that every piece of property is unique. Thus, in determining whether the facts in evidence authorize a finding that the elements of adverse possession have been satisfied, each case must be decided in light of its own unique circumstances. Much depends on the location, the character and the use to which the land in question may reasonably be put. *Lossing v. Shull*, 351 Mo. 342, 173 S.W.2d 1 (1943). Those specific manifestations of possession and ownership exhibited by a claimant which would support a finding of title by adverse possession in a populous and highly developed area are not the same as those which would support such a finding where, as here, the property is sparsely populated farm and waste land. *Feinstein v. McGuire*, supra.

■ The essential requirement of adverse possession is that the possessor's occupancy be truly adverse and in opposition to the title of the record owner. *Russell v. Russell*, 540 S.W.2d 626 (Mo.App.1976). The claimant must occupy the particular piece of property intending to possess it as his own. His occupancy must be in defiance of, not in subordination to, the rights

5. Defendants forgave a $3,000 debt owed by the Essens in exchange for the property. The purchase price, therefore, was only $10 per acre, an insubstantial sum even at 1950 prices.

of others. *Benson v. Fekete*, 424 S.W.2d 729 (Mo. banc 1968); *Mooney v. Canter*, 311 S.W.2d 1 (Mo.1958). An adverse possessor does not recognize the authority of the record titleholder to permit or to prevent his continued use of the property claimed. *Benson v. Fekete*, supra. Such adversity is shown by satisfaction of the five elements of adverse possession.

■ The first element is actual possession. Two concepts are relevant in determining whether a claimant has established his actual possession of the land claimed. They are his present ability to control the land and his intent to exclude others from such control. *Miller v. Warner*, supra; *Hamburg Realty Co. v. Walker*, supra. Where the claimant occupies land without color of title, in order to prevail, he must show physical possession of the entire area claimed. *Pharis v. Jones*, 122 Mo. 125, 26 S.W. 1032 (1894); *Wykle v. Colombo*, supra. A mere mental enclosure of land does not constitute the requisite actual possession. *Wilson v. Purl*, 148 Mo. 449, 50 S.W. 90 (1899). Rather, there must be continual acts of occupying, clearing, cultivating, pasturing, erecting fences or other improvements and paying taxes on the land. The performance of all or any combination of these acts of occupancy serves as evidence of actual possession but is not conclusive. See *Dunlop v. Hartman*, 338 S.W.2d 10 (Mo. 1960); *Brown v. Evans*, 182 S.W.2d 580 (Mo.1944); *Jamison v. Wells*, 7 S.W.2d 347 (Mo.1928); *McVey v. Carr*, 159 Mo. 648, 60 S.W. 1034 (1901); *Franklin v. House*, 533 S.W.2d 243 (Mo.App.1976); *Moise v. Robinson*, 533 S.W.2d 234 (Mo.App.1975). Each case must be decided on its own peculiar facts.

■ Where the claimant occupies land under color of title the requirement of actual possession of the entire area claimed is relaxed. By statute, one who occupies land under color of title is required only to physically possess a part of the tract claimed in the name of the whole, if during the period of possession he exercises the usual acts of ownership over the whole. § 516.040 RSMo. 1969. Thus, color of title is not an element of adverse possession, but it serves to extend actual possession of some portion of the land claimed to constructive possession of the whole tract described in the instrument providing the basis for color of title.[6] *Moran v. Roaring River Dev. Co.*, supra; *Cullen v. Johnson*, 325 Mo. 253, 29 S.W.2d 39 (1930). The instrument relied upon as color of title must be bona fide and must purport on its face to convey title to the land. *Crispen v. Hannavan*, 50 Mo. 536 (1872); *Moise v. Robinson*, supra. It need not actually convey legal title so long as it pretends to make the claimant the apparent owner. Even a void deed is sufficient to constitute color of title if it includes within its description the land claimed. *Moran v. Roaring River Dev. Co.*, supra; *Jamison v. Wells*, supra; *Moise v. Robinson*, supra.

■ In addition to describing the land claimed, it is also required that the true owner have actual or constructive notice of the instrument and its contents. Thus, he must be advised not only of the claimant's actual possession, which must be open and notorious to satisfy the requirements of adverse possession, but also the constructive extent and boundary of the land claimed. *Hughes v. Israel*, 73 Mo. 538 (1881); *Crispen v. Hannavan*, supra. This can only be known by being actually apprised of the contents or having the opportunity to be so apprised by the fact of recordation of the instrument bestowing color of title. Once color of title is established, less weight of evidence is required to support an adverse entry under its apparent authority than for a bare entry by one without a claim of right. *Moran v. Roaring River Dev. Co.*, supra; *Feinstein v. McGuire*, supra.

---

**6.** There has been some confusion over the distinction between color of title and claim of right. The former relates to the existence of a deed or proceeding which apparently vests the title to the land in question in the claimant. The latter is part of the element of hostile possession and requires that claimant enter and remain on the land with a belief that his right to do so is superior to that of the alleged owner. *George v. Dickinson*, 504 S.W.2d 658 (Mo.App.1974).

The second element which must be proved to establish adverse possession is that the possession be hostile or under a claim of right. Naked possession asserted for any period of time, no matter now lengthy, is insufficient to ripen into adverse possession. *Fiorella v. Jones*, 259 S.W. 782 (Mo.1924). For possession to be hostile it is neither required that the true owner have knowledge of the hostile claim of right or that the claimant intend to deprive him of title. *Glenville v. Strahl*, 516 S.W.2d 781 (Mo.App.1974). The possession must be opposed and antagonistic to the claims of all others, i. e., the claimant must occupy the land with the intent to possess it as his own and not in subservience to a recognized, superior claim of another. *Walker v. Walker*, supra; *Gates v. Roberts*, 350 S.W.2d 729 (Mo.1961). Furthermore, the claim of right or ownership must be unequivocal. *Reinheimer v. Rhedans*, 327 S.W.2d 823 (Mo. 1959).

The third element of adverse possession is that the possession be open and notorious. To satisfy this element it is necessary to prove that the claimant's occupancy was conspicuous, widely recognized and commonly known. *Long v. Lackawanna Coal & Iron Co.*, 233 Mo. 713, 136 S.W. 673 (1911). One may not acquire title by adverse possession if his occupancy has been so covert that it is unknown to the persons who deal regularly with and around the land claimed. The reason the law requires open and notorious possession for title to ripen by adverse possession is to give the owner cause to know of the adverse claim of ownership by another. Thus, if the true owner has actual knowledge that another claims in defiance of and in opposition to his title, the openness and notoriety requirement is satisfied. It is not the mere knowledge of occupation of his land by another which will prejudice the true owner's rights under his title. Rather, it is the adverse and hostile character of the occupation which must be known. *Sellers v. Swehla*, 253 S.W.2d 847 (Mo.App.1952). If actual knowledge is not proved then the claimant must show an occupancy so obvious and well recognized as to be inconsistent with and injurious to the real owner's rights that the law will authorize a presumption from the facts that he had such knowledge. *Miller v. Warner*, supra; *Burnside v. Doolittle*, 324 Mo. 722, 24 S.W.2d 1011 (1930).

The fourth element of adverse possession, that of exclusivity of possession, only requires that the claimant occupy the land for his own use and not for that of another. *Walker v. Walker*, supra; *Gates v. Roberts*, supra. Generally, one may not be vicariously vested with title by adverse possession as a result of possession by another, though where there is the requisite relationship between the parties, tacking of possession is allowed. See *Lurvey v. Burrell*, 317 S.W.2d 458 (Mo.1958); *Crispen v. Hannavan*, supra. Two or more persons may acquire title to the same property by adverse possession as cotenants if they had exclusive joint possession for the statutory period. *Wilton Boat Club v. Hazell*, supra.

The final element of adverse possession is that the occupancy be continuous, i. e., without lapse, for the entire statutory period. Temporary absence from the land without an intention to abandon possession will not break the continuity of possession; intermittent and sporadic occupancy will. *Feinstein v. McGuire*, supra. In judging the continuity of possession, the character and use to which the land is adaptable must be taken into account. For instance, under the facts of this case, the periodic flooding which made access to and use of the property impossible for entire growing seasons would not interrupt the continuity of possession unless there was an intent to abandon possession after the waters receded.

One overriding requirement to establish adverse possession to a particular piece of property is that the precise location of the land claimed be identified in such a way that the boundaries may be ascertained and recognized. *Wilson v. Purl*, supra. Absent proof by claimant of the exact location of lands claimed, any judgment would be void, because it would rest entirely on speculation and conjecture. *Hughes v. Israel*, supra.

We will now review the proof as adduced at trial to determine whether claimants have met their burden of establishing title by adverse possession. Because this is a court tried case, we must follow the dictates of Rule 73.01 V.A.M.R. Thus, we review both the law and the evidence giving due recognition to the superior position of the trial court to judge the credibility of the witnesses.[7] *Albert v. DeClue,* 526 S.W.2d 39 (Mo.App.1975). The judgment must be sustained unless it is without substantial evidentiary support, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976); *State ex rel. Shepherd v. St. Louis County,* 542 S.W.2d 55 (Mo.App.1976).

The land claimed by Lawrence Teson is a fertile 75 acre strip contained within the prolongation of the United States survey 146 extending north of Aubuchon Road to the Missouri River. It lies within the river's floodplain with the result that the low-lying areas are often covered by back water from the several sloughs which traverse the land. In 1950 when the Essens conveyed this land to defendants, it was almost totally overgrown with timber, brush and vines. Only a negligible portion was suitable for farming. The only commercial activity on the land at that time was intermittent timber and pulp wood removal by various persons.

In 1925, Teson was conveyed title by quitclaim deed to 23¹¹⁄₁₀₀ acres lying within United States survey 146 immediately adjacent to Aubuchon Road. There was no mention in this deed of land lying north of Aubuchon Road or of any right.to accretions. Nevertheless, Teson testified that it was his understanding that the deed conveyed not only the land lying south of Aubuchon Road but also accretions on the north to the river. It is uncontested that

Teson did in fact farm a parcel of the land claimed immediately north of Aubuchon Road continuously since 1941 when the elements permitted. So much of this parcel as lies between Aubuchon Road and Cowmire Creek is not in controversy, because defendant has disclaimed any rights of ownership to land south of Cowmire Creek. Whether the parcel farmed by Teson near Aubuchon Road included land north of Cowmire Creek was in dispute.

In addition to farming the southern parcel Teson claims that he and his sons began clearing and farming small "spots" (4–5 acres each) on the north near the river sometime in the late 1950's. Exactly where these "spots" were located and whether they were kept continuously cleared in the wake of the periodic floods which inundated the land is not clear from the evidence. These early instances of clearing were accomplished by man and horse power alone, without the aid of modern equipment. In the early 1960's the pace of clearing was accelerated and larger sections of land within the strip claimed by Teson were made tillable and were farmed. By 1962 twelve acres, 1500–2000 feet south of the river's bank, were suitable for farming. In 1964, Teson hired a heavy equipment operator for a few days to help clear more land. This clearing activity has continued so that at the time of trial approximately 50 acres were cleared and used as farmland. Though Teson, who was 81 years of age at the time of trial, testified that he continuously farmed lands on the northern end of the property near the river prior to 1960, he admitted in his deposition that he only began farming this tract a few years prior to trial, because before that time it was all timber.

Teson testified that the boundary of the land he claimed was marked by cedar and iron posts from Aubuchon Road back to the

---

7. Defendant contends that the trial court, in reaching its decision in the Teson case, improperly relied on certain aerial photographs not admitted into evidence in that case. Such reliance was error. Nevertheless, on appeal from a court tried case the reviewing court is required to disregard any incompetent evidence improperly considered and base its judgment on the competent evidence admitted at trial. *Giraldin Bros. Real Estate Co. v. Stiansen,* 315 S.W.2d 636 (Mo.App.1958). We do not consider any photographs not admitted into evidence in the Teson case in reaching our decision.

river. He admitted that the iron posts were implanted after a survey he had conducted five to seven years prior to the trial. Teson claimed that at one time fences existed in places along his claimed boundary but that they were washed out by floods. At the time of trial no fences existed marking any boundaries on this property.

In addition to cutting timber, clearing brush and farming the reclaimed areas, Teson claimed to have paid taxes on the property from 1925 to 1965. He introduced receipts for those years showing that he paid taxes on 75 acres of accretions, but the receipts did not specify where those 75 acres were located. Further, in 1968, Teson paid over $1400 for repair to a levee crossing the parcel claimed. He also claims to have ejected various hunters and other intruders from the land over the years. He contends that at one time in the 1950's, he personally warned defendant not to intrude on the property he claimed.

Defendant relies solely on the 1950 quitclaim deed from the Essens as the basis for his claim of title. Defendant rarely visited this property. He averaged only ten visits per year over the entire 300 acre tract, and these were primarily for recreational purposes. 1953 was the only year defendant farmed any part of the land claimed, and he planted only a few acres near the river. Defendant, who owned an excavating business, directed his employees to enter the property with heavy equipment in 1964 to clear approximately ten acres to be used for farming by his relatives. Also, defendant paid real estate taxes on the property from 1948 to the time of trial. He carried liability insurance on the property from 1959.

Defendant testified that he never saw Teson on the contested property prior to 1964. Several witnesses, adjoining landowners and former farm laborers, testified that they observed no farm activity on the tract claimed by Teson prior to the early 1960's when small patches of land near the river were cleared of underbrush.

The trial court held that Teson's 1925 deed did not constitute color of title. Nevertheless, it held that Teson had established the elements of adverse possession to a tract of approximately twenty acres adjacent to Aubuchon Road extending north of Cowmire Creek to a small tarn known as "Round Pond." Title to a second parcel of almost forty acres near the river was also vested in Teson. Title to the land between these two parcels was quieted in defendant.

 Under the foregoing facts we affirm the trial court's judgment as to the parcel near Aubuchon Road and reverse as to the parcel near the river. The trial court correctly concluded that Teson could claim no color of title to the property north of Aubuchon Road under his 1925 deed. As such, he could acquire title by adverse possession only to the lands he had actually physically possessed for the statutory period. Teson's proof failed to establish that he had continuously and actually possessed any specific portion of the property near the river. There was testimony of sporadic clearing and cultivation of land somewhere near the river over the years by various persons, including defendant and his relatives. There was little credible evidence of any sustained and permanent clearing until the mid 1960's. Teson admitted in his deposition that he had not farmed the northern portion of the land claimed until the last few years before the trial, because it was covered with timber. Though there is sufficient proof that Teson and his sons did engage in some farming activities on the land near the river, the evidence completely failed to establish the precise boundaries of any tract Teson used for the statutory period.[8] As such, the trial court had no basis to conclude that Teson actually and continuously possessed the 40 acre tract it awarded him.

Furthermore, title by adverse possession to land near the river could not vest in Teson, because his possession was not open and notorious for the entire statutory peri-

---

8. The trial court admitted on its Findings of Fact and Conclusions of Law that "We find no way to describe the (southern) boundary of the river-side land we might want to set off to him."

od. There is no evidence that defendant had actual knowledge of Teson's possession. Nor does the record reveal sufficient facts from which we could presume constructive knowledge on the part of defendant. Teson's presence on the land was only sporadic and until the mid 1960's was confined to small areas which he could clear with hand equipment. The land was densely thicketed with trees, brush and vines which served to obscure any progress made. Moreover, there were no fences or other readily observable boundaries. Thus, the trial court's finding of title by adverse possession to the northern 40 acres in Teson was in error, because actual, open and notorious possession was not proved. Nor were exact boundaries established to any smaller parcel for which the elements of adverse possession may have been satisfied. Therefore, the trial court's designation of title to the northern 40 acres in Teson was speculative and conjectural and cannot stand.

As to the southern portion near Aubuchon Road, it cannot be said that the trial court erred in finding title by adverse possession in Teson. It is clear that Teson had acquired title to the tract between Aubuchon Road and Cowmire Creek by adverse possession. Defendant disclaimed any interest in this property, and its ownership was not in controversy. The land in question is only that which lies between Cowmire Creek and Round Pond.

The testimony was conflicting, but there was competent evidence that Teson had farmed the 20 acres between Aubuchon Road and Round Pond continuously for a time well beyond the statutory period. This parcel, unlike that near the river, was in plain sight from Aubuchon Road. The cultivation must have been clearly visible from the public thoroughfare and open and notorious.

■ The trial court's finding of title in defendant to the center portion of the tract claimed by Teson was correct. Defendant introduced a recorded quitclaim deed clearly encompassing this area. For the purpose of conveying title, a quitclaim is as effective as any other deed. *Grimes v. Rush*, 355

Mo. 573, 197 S.W.2d 310 (1946). Teson, on the other hand, relied entirely on an adverse possession theory which he failed to prove. He had no basis on which to claim this center portion as the trial court correctly concluded.

The land claimed by Sommers is that included within the prolongation of United States survey 154 lying north of Old Charbonnier Road to the Missouri River. Sommers contends that the land was conveyed to him and his wife on October 3, 1952, by a warranty deed from John Little and wife. The deed described the land as consisting of 3½ acres in the western portion of survey 154 but further recited that the land was bounded by the Missouri River with all accretions.

Defendant Vasquez claims title to the property in question north of Cowmire Creek under the 1950 quitclaim deed from the Essens. He disclaims any title to land within the prolongation of survey 154 lying south of Cowmire Creek.

Shortly after Mr. Sommers took possession of the property in 1952, he erected fences along the entire prolongation of survey 154 to the Missouri River. He maintained those fences until the early 1960's. During this period he also constructed a barn just north of Cowmire Creek. His agricultural activities included raising a small number of Brahman cattle and up to 80 horses on the property. Although about 80% of the property was already cleared in 1952, Sommers continued the clearing operations so that almost the entire area was cleared by the time of the trial.

Sometime between 1960 and 1967 Sommers traded the use of land claimed by him north of Cowmire Creek to St. Stanislaus Seminary, an adjacent landowner, for the use of other seminary property. The seminary then removed the fences north of the creek and farmed the land as its own until 1971 when another party purchased the seminary property. Sommers testified, however, that he continued to use the barn north of Cowmire Creek until 1965. Both Vasquez and Sommers claimed to have paid real estate taxes on the property.

Defendant testified that at the time he was conveyed the property in 1950 it was used for crop and pasture land and that fences were on the eastern and western boundaries. He acknowledged that he never made use of the property but stated that it was he who gave permission to St. Stanislaus Seminary to use the land in 1960 or 1961. Defendant admitted that as early as 1954 he was aware that a barn had been constructed and that livestock was being raised on the property.

■ The trial court correctly concluded that the recorded deed from the previous owners, the Littles, to the Sommers gave the latter color of title to the land claimed. Though ambiguous because of the reference to the 3½ acre plot, the deed clearly purports on its face to convey title in Sommers to land bounded on the north by the Missouri River with all accretions. The only real challenge to the court's finding that Sommers established title by adverse possession relates to whether his possession was continuous for the requisite period. The evidence shows that Sommers entered into possession of the property in 1952 and exercised sufficient dominion over it until the trade so that title could be vested in him by adverse possession. The evidence does not clearly and unambiguously establish the date of the trade with the seminary. Sommers, an elderly gentleman who had suffered a stroke just prior to trial, testified as to various dates between 1960 and 1964. Other witnesses, who lived or worked nearby stated that the trade occurred in 1967. No one from the seminary testified as to the date of the trade.

■ No question of law is presented under these facts. We are faced squarely with a question of the credibility and accuracy of the various witnesses. We defer to the superior opportunity of the trial court to judge the credibility of the witnesses and to resolve the inconsistencies in testimony. The judgment quieting title in claimant Sommers must be affirmed.

The property claimed by Keeven and Behle consists of 76 acres lying within the prolongations of United States surveys 149 and 150 between Cowmire Creek and the Missouri River. They rest their claim of ownership on adverse possession but argue they have at least color of title by virtue a 1963 warranty deed from Mary Hagen. The Hagens were purportedly conveyed title to this property in 1954. At that time, little of the property had been cleared for farming. But Hagen initiated clearing operations so that by 1962, 20 acres near the river and 15–20 acres near Cowmire Creek were cleared and farmed. Hagen used the uncleared middle section to raise hogs. Hagen's farming operations continued until the fall of 1961 when he failed to harvest his soybean crop. He died in early 1962.

After Mrs. Hagen gave Keeven and Behle the deed in April of 1963, they immediately began to fence the eastern and western boundaries of the land from Cowmire Creek to the river. Once the fencing project was completed in October, 1963, cattle were placed on the property. Simultaneously with the fencing, claimants began clearing the land of its dense overgrowth of floodplain vegetation. By 1965 they had cleared over 30 acres for farming. They planted this acreage in bluegrass for use in their commercial sod business and installed a portable irrigation system. After a few years the cattle were removed and about 500 head of hogs were placed on the property. From 1963 until the time of trial claimants paid taxes on this property.

Defendant claims the property under the 1950 Essen deed. He rarely visited this property, though he admitted seeing some small areas farmed and noticed a few stray hogs on the property in the mid 1950's. Defendant first learned that Keeven and Behle claimed the land in the prolongation of surveys 149 and 150 at a wedding the parties attended in 1963. At that time defendant told them that he had prior deed to the same property and that Keeven and Behle had better check their title. Defendant maintains that he told them that they could go ahead and use the property until "the deeds were straightened out." Obviously, the disputed claims of ownership were not reconciled though defendant, and

Keeven had several telephone conversations on the subject subsequent to their meeting at the wedding. In addition to Keeven and Behle, defendant maintained that he had given permission to Donald Teson, Louis Tebeau and the priests at St. Stanislaus Seminary to farm his bottom land including the surveys 149 and 150 parcels. He neither charged nor received rent from any of the parties. The trial court held that Keeven and Behle had established their title by adverse possession to the entire parcel claimed.

The property claimed by the Klaus' consists of 40 acres. It is situated within the prolongation of United States survey 148 between Cowmire Creek and the Missouri River. They claimed color of title by a 1960 warranty deed from Laura Aubuchon. The deed specified 15 acres but stated that the western boundary was the Missouri River. The Klaus' visited the property even less than did defendant. Mr. Klaus admitted in his 1973 deposition that he had not stepped foot on the property for over 10 years. The only use made of the land was to rent it to various persons including Keeven and Behle. Before the property was rented only a small portion of the land was farmable (less than 20 percent). But Keeven and Behle cleared the land so that at the time of the trial 90 percent was farmable.

Defendant made no use of the property himself but claimed to have given permission to others to farm it. He continued to pay real estate taxes and maintained insurance on the property. At the conclusion of the trial the court ruled in defendant's favor finding that Klaus had failed to establish a title by adverse possession.

■ Defendant's challenge to Keeven and Behle's claim of title by adverse possession goes solely to the continuity of possession. In order to prevail, claimants must be able to tack their possession to that of their grantors, the Hagens. When the Hagens took possession of this property in 1954, they were presented with a deed from the prior owner which set the northern boundary of their property at the Missouri River. Therefore, they occupied the land under color of title. As such, the Hagens needed only to have actual possession of a part of the property with the intent to possess the whole. This they did. Mr. Hagen cleared and farmed sections near the river and Cowmire Creek in addition to raising hogs on the property. It is true that Mr. Hagen failed to harvest his soybean crop in the fall of 1961, but in light of the fact that he died in early 1962 the trial court could reasonably conclude that he had not abandoned the property. The finding of continuous possession for the statutory period by tacking the possessions of the Hagens and Keeven and Behle has support in the record. The trial court's judgment quieting title by adverse possession in them is supported by substantial evidence and is affirmed.

■ As to the Klaus property there was no evidence that any element of adverse possession was satisfied by the claimants. The only evidence of possession of the property was the fact that the Klaus' had rented the property to various persons. Rental alone is insufficient to prove adverse possession. The trial court's judgment quieting title in defendant as against the Klaus challenge is affirmed.

■ Finally, claimants Klaus and Teson contend that the trial court erred in quieting title in defendant to lands claimed by them, because defendant's title was based on a "mere quitclaim deed" without proof of chain of title. Defendant relied solely on the recorded quitclaim deed from the Essens as the basis for his title. Teson did not even establish color of title, as his deed could not be interpreted to include the property claimed. When he failed to prove adverse possession he had no claim to the property. Likewise, the Klaus' relied on the theory of adverse possession for their title, which they also failed to prove. The deed they possess was only introduced into evidence to prove color of title and not ownership. They cannot now assert title on the basis of their deed. We will not review a case on a theory different from that on which it was tried. *Russell v. Russell*, supra. In a quiet title action each party has the burden to prove superior title to the

other, not superior to the whole world. *Baxter v. Vasquez,* supra. They must prevail on the strength of their own title, not the weaknesses of their opponents. *Hall v. Hudgins,* 277 S.W.2d 637 (Mo.1955). Claimants have failed to prove title by adverse possession and have not attempted to prove title under any other theory. Defendant has shown title by his recorded 1950 deed. The fact that it is a quitclaim deed does not deprive it of validity, as a quitclaim deed is as effective as any other to transfer title. The judgment of the trial court quieting title in defendant to the tract claimed by Klaus and the tract claimed by Teson north of Round Pond must be affirmed.

KELLY and WEIER, JJ., concur.