Orville S. HEIDE, et ux.,
Plaintiffs-Respondents,

v.

Raymond L. SHEEKS, et ux.,
Defendants-Appellants.

No. 13445.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 17, 1984.

John E. Price, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, James E. Curry, Ava, for defendants-appellants.

W. Price Harned, Gainesville, for plaintiffs-respondents.

FLANIGAN, Judge.

Plaintiffs Orville Heide and Dorothy Heide, husband and wife, brought this action against defendants Raymond Sheeks and Carolyn Sheeks, husband and wife, seeking to quiet title to 64.2[1] acres of rural land in Ozark County. The trial court, sitting without a jury, found the issues in favor of plaintiffs. Defendants appeal.

■ Plaintiffs, who base their claim on adverse possession, had the burden of proving by the preponderance of the evidence the existence, for the statutory period, of every element of adverse possession. They had the burden of showing actual, hostile (i.e. under a claim of right), open and notorious, exclusive, and continuous possession of the disputed land for 10 years. Failure to prove any element prevents the ripening of title by adverse possession. *Teson v. Vasquez*, 561 S.W.2d 119[1, 2] (Mo.App. 1977) and authorities there cited.

1. The judgment of the trial court decreed that plaintiffs were the legal owners of the 64.2 acres mentioned in the pleadings and also an additional 18.6 acres. At oral argument the parties agreed that the 18.6 acres were improperly included in the judgment and should be deleted.

Defendants challenge the adequacy of plaintiffs' proof with respect to each of the elements. Defendants also contend that the judgment, in finding the presence of all the elements, is against the weight of the evidence.

 Appellate review of this action is governed by Rule 73.01, V.A.M.R., as construed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). See *Roth v. Flieg*, 536 S.W.2d 39 (Mo. banc 1976). This court must sustain the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence or unless it erroneously declares or applies the law. Setting aside the judgment on the ground that it is against the weight of the evidence is a power to be exercised "with caution and with a firm belief that the ... judgment is wrong." *Murphy v. Carron*, supra, at 32. For the reasons which follow, this court finds merit in the appeal and reverses the judgment.

Although both plaintiffs and defendants own other land in the area, this litigation concerns two 160-acre tracts. Plaintiffs have record title to one of the tracts and defendants have record title to the other. Each tract consists of four "square 40s." For the purpose of this opinion plaintiffs' four 40s will be designated Lot 1, Lot 2, Lot 3, and Lot 4, and defendants' four 40s will be designated Lot 5, Lot 6, Lot 7, and Lot 8.

Lot 1 is the westernmost 40 of plaintiffs' land, Lot 2 lies immediately east of Lot 1, Lot 3 lies immediately east of Lot 2, and Lot 4 lies immediately east of Lot 3. Lot 5 lies immediately south of Lot 1, Lot 6 lies immediately south of Lot 2, Lot 7 lies immediately south of Lot 3, and Lot 8 lies immediately south of Lot 4. From the record title standpoint, the true boundary between the two 160-acre tracts is one mile long, running east and west, and is the south border of plaintiffs' land and the north border of defendants' land.

The 64.2 acres in dispute lie south of the true boundary and north of an old meandering fence. Generally speaking, the fence commences at a point on the west line of Lot 5, the point being approximately 459 feet south of the northwest corner of Lot 5. From that western terminus the fence meanders northeasterly across Lot 5 and then turns easterly and enters Lot 6. It then proceeds northeasterly to a point very close, perhaps within five feet, of the northeast corner of Lot 6 where it encounters a bluff. The fence then turns south and enters Lot 7 and meanders generally easterly across Lot 7 until it reaches a point on the west line of Lot 8 at which point it turns south-southeasterly and proceeds deep into Lot 8 to a point approximately 1307 feet south of the north line of Lot 8. From that point it proceeds northeasterly to the east line of Lot 8.

The disputed land consists of 17.7 acres in Lot 5, 10.4 acres in Lot 6, 9.6 acres in Lot 7, and 26.5 acres in Lot 8.

Plaintiffs presented seven witnesses: plaintiff Dorothy Heide, plaintiff Orville Heide ("Orville"), Loma Foster, Gareth Heide (son of plaintiffs), O.J. Friend, Elmer McFarland and Bobby Robbins. The last three of those witnesses were employees of defendants. The defendants presented three witnesses: surveyor James Henderson, defendant Raymond Sheeks, and the county assessor. The latter gave unchallenged testimony that the taxes on the disputed land had been paid by defendants and their predecessors. As will be seen, several of the plaintiffs' witnesses gave testimony damaging to the plaintiffs.

The presentation of the evidence was not too orderly and some of the testimony is vague. The plaintiffs acquired Lot 1 in 1963 and later that year obtained title, from another source, to Lots 2, 3, and 4. The latter three lots are called "the Foster place." Before plaintiffs obtained title to the Foster place, it was owned by Loma Foster and her husband.

 Loma Foster testified that the meandering fence had been in place since prior to 1937. She testified that her husband cultivated undefined portions of Lots 6, 7, and 8 lying north of the fence. Her testimony, however, did not mention how long that cultivation lasted and she also indicated that the cultivation ended four or

five years before 1963. Her testimony was insufficient to show that she and her husband had established title by adverse possession to the disputed portions of Lots 6, 7, and 8, the most glaring omission being that she failed to testify that any possession of the disputed land on their part had lasted continuously for 10 years. That possession, of unknown duration, ended several years before plaintiffs occupied the Foster place and thus there is no issue of possible "tacking," for the Foster possession of the disputed land was not continuous with that of plaintiffs.[2]

Defendants acquired record title to their 160 acres in June 1980. The meandering fence, which defendants admit "has been in existence at least 50 years," consisted, in places, of barbed wire, and, in other places, of woven wire, nailed to wooden posts and tree trunks. Dorothy Heide described the fence as being "pretty decrepit." The eastern portion of the fence, in Lot 8, was "an old rail fence." There was no testimony concerning who originally installed the fence or the reason for its installation, nor was there evidence of any express agreement between the respective predecessors of the parties that the fence would constitute the boundary.

 Dorothy Heide testified that her husband ran cattle on at least some portions of the disputed area and Orville testified that he had cut some timber off it. "[P]asturing cattle or cutting timber do not in themselves establish adverse possession ... but they do tend to show claim of ownership...." *Miller v. Warner*, 433 S.W.2d 259, 264 (Mo.1968). Orville conceded, however, that the disputed area is "rough, mostly glade land, forest, timber.... We are not talking about farm land." Dorothy described the disputed land as "hilly timber land and forest land. We are not talking about any cultivated fields, we never did cultivate it."

There are four significant events which illuminate the issues and control their resolution. Those events, in the order of their occurrence, are: (1) the making of the Sneerbusch survey; (2) the making of the Henderson survey; (3) the bulldozing of the true boundary—that is, the one-mile-long east-west boundary between the two 160-acre tracts; and (4) the follow-up bulldozing.

In 1979, prior to defendants' acquiring title to their 160 acres, a surveyor named Sneerbusch was employed by Orville and by another landowner to make a survey which included the one-mile boundary line between Orville's 160 acres and the 160 acres now owned by defendants. Orville contributed $60 to that survey. Although Orville disclaimed seeing Sneerbusch's plat of the survey, if in fact he made a plat, both Orville and his wife admitted seeing ribbons placed by Sneerbusch on trees to indicate the boundary line.

On his deposition, given a month before the trial, Orville testified that the boundary line, as found by the Sneerbusch survey, was "300 or 400 yards down the hill" from the fence. Orville also said in his deposition that Sneerbusch "located the line about where the bulldozed line [was later] cut through," a reference to the third significant event to be discussed later. At the trial, however, Orville testified that the Sneerbusch line "followed the fence.... There was variation, a little bit, just maybe a few feet on one side and a few feet on the other." This court finds that Orville's trial testimony with regard to the Sneerbusch line, which is at variance with the testimony of the other witnesses (including Orville's witnesses), is unworthy of belief.

The ribbons left by Sneerbusch were also seen by O.J. Friend, Elmer McFarland, and defense witness James Henderson, a fact which will be mentioned later. Orville, who had worked with a survey crew in the 1940s, testified that he knew a surveyor

---

2. "Adverse possession must be shown to have been continuous and unbroken for the whole prescribed period of limitation." *Allen v. Wiseman*, 359 Mo. 1026, 224 S.W.2d 1010, 1013[6] (1949). "The moment the possession is broken, it ceases to be effectual, because as soon and as often as a break occurs, the law restores the constructive possession of the owner." 3 Am. Jur.2d Adv.Poss. § 54, p. 144.

"runs straight lines" and, of course, the line which Sneerbusch was surveying ran straight east and west.

In May 1982 defendants employed James Henderson, a registered surveyor, to survey the boundaries of their land, including the one-mile boundary line between the two 160-acre tracts. Henderson made the survey and his plat, which shows the location of the boundary line and the meandering fence, was introduced into evidence. Henderson, of course, was surveying the same boundary line previously surveyed by Sneerbusch. Henderson testified that the two lines generally coincided over the course of the mile. He, too, had seen the ribbons left by Sneerbusch. Henderson testified that there might be a "few feet difference ... 5 to 10 feet variation" between the line as surveyed by him and the Sneerbusch line.

The third significant event was the bulldozing of the true boundary—the bulldozing along the boundary line as surveyed by Henderson. Henderson testified that the day before this bulldozing took place he had notified Orville to be there because they were going to do the bulldozing. On the day of the bulldozing, and before it took place, several of the witnesses gathered on the ridge road, which runs generally north and south along the west side of Lot 7 and enters Lot 2. Present were Orville, Dorothy Heide, O.J. Friend, Elmer McFarland, Bobby Robbins, and James Henderson. It will be observed that all of these people, except Henderson, were plaintiffs' witnesses.

Using two bulldozers, and then only one because the other broke down, Friend and McFarland bulldozed a "swath" along the boundary line as located by the Henderson survey. By the use of signals and walkie talkies, Henderson directed the movements of the bulldozers so that the swath was cut along the true boundary. Although the record does not show the width of the swath, both sides introduced photographs of it, including aerial photographs, and it appears to be at least the width of a country road also shown in the aerial photographs.

Friend testified that the swath was cut for the entire mile between the two 160-acre tracts and that this dozing "took a day or a little more." As previously indicated, the dozing commenced at the ridge road, which is one-fourth of a mile east of the western terminus of the true boundary line, and proceeded easterly. Friend, McFarland, and Henderson all testified that the bulldozers, in following the Henderson line, also followed the ribbons of the Sneerbusch line.

Before the bulldozing commenced, according to the testimony of Friend, McFarland, and Robbins (all plaintiffs' witnesses), and defense witness Henderson, a conversation took place between Orville and Robbins to the effect that the swath made by the bulldozers would be "a little wider than normal," if Orville so desired, in order to accommodate a road for Orville's use on the north side of the fence which was to be erected on the swath. Orville said such was his desire. Significantly, Orville did not dispute that testimony.

Dorothy Heide testified that the swath varied "150 to 300 feet" from the meandering fence but generally "stayed pretty even" with the fence. The fact is, of course, that the deviation of the meandering fence from the swath exceeded 1300 feet at one point.

It is most significant that at no time during the bulldozing of the swath did Orville or his wife complain about the making of the swath itself. At no time did they say, "Don't bulldoze through there. You are hundreds of feet north of what we claim to be our southern boundary." Indeed the record offers no explanation at all for the swath itself to have been cut except for the purpose of delineating the true boundary and erecting a new fence.

Several days later, the record does not disclose how many, McFarland was doing some "follow-up" bulldozing in the disputed area, that is, south of the swath made by the bulldozers and north of the meandering fence. Gareth Heide confronted Friend and McFarland and asked them to stop bulldozing. Gareth had not been

present while the swath was being bull-dozed. Gareth was acting on behalf of his parents. Thus the anomaly arises that, belatedly, the plaintiffs, through their son, objected to the follow-up bulldozing but had previously made no objection at all to the bulldozing of the swath. This court agrees with defendants that such conduct on the part of the plaintiffs, in not objecting to the bulldozing to the cutting of the swath, was strong evidence that they were not claiming ownership of the disputed land.

 "The second element which must be proved to establish adverse possession is that the possession be hostile or under a claim of right. *Naked possession asserted for any period of time, no matter how lengthy, is insufficient to ripen into adverse possession. Fiorella v. Jones,* 259 S.W. 782 (Mo.1924). For possession to be hostile it is neither required that the true owner have knowledge of the hostile claim of right or that the claimant intend to deprive him of title. *Glenville v. Strahl,* 516 S.W.2d 781 (Mo.App.1974). *The possession must be opposed and antagonistic to the claims of all others, i.e., the claimant must occupy the land with the intent to possess it as his own and not in subservience to a recognized, superior claim of another. Walker v. Walker,* supra [509 S.W.2d 102 (Mo.1973)]; *Gates v. Roberts,* 350 S.W.2d 729 (Mo.1961). *Furthermore, the claim of right or ownership must be unequivocal. Reinheimer v. Rhedans,* 327 S.W.2d 823 (Mo.1959)." *Teson v. Vasquez,* 561 S.W.2d 119, 127 (Mo.App.1977) (emphasis added).

 This court holds that the finding of the trial court of the presence of the "second element" is against the weight of the evidence and that the trial court erred in not decreeing that title to the disputed land was in defendants.

A man does not agree to the cutting of a wide swath through a forest, the installation of a new fence along it, and the building of a road on the north side of it when in fact he is claiming title to the area of all of the swath itself and approximately 60 acres

lying south of it which would be enclosed by the new fence.

The judgment is reversed and the cause remanded for entry of a new judgment consistent with this opinion.

TITUS, P.J., and GREENE, J., concur.