**Nova FOSTER, successor guardian of the person and Estate of A. A. Anderson, Incompetent, Respondent,**

v.

**Opal P. HENDERSON and Willie Pearl Wiyrick, Appellants.**

**No. 27309.**

Missouri Court of Appeals, Kansas City District.

July 6, 1976.

Clifford B. Mayberry, Kirksville, for appellants.

Geoffrey L. Gifford, Gifford & Gifford, Green City, for respondent.

Before TURNAGE, P. J., and ROBERT R. WELBORN and ANDREW J. HIGGINS, Special Judges.

ANDREW J. HIGGINS, Special Judge.

Appeal from judgment which set aside warranty deeds of A. A. Anderson to Opal P. Henderson and Willie Pearl Wiyrick on ground that the grantor lacked mental capacity to execute the deeds. Appellants contend the judgment should be reversed "since no clear, cogent and convincing evidence was offered to show that Mr. Anderson was incompetent at the time of the execution of the deeds * * *." See *Cruwell v. Vaughn*, 353 S.W.2d 616 (Mo. 1962); *Webb v. Heddleson*, 327 S.W.2d 101 (Mo.1959). Affirmed.

Alfred Anderson, born in 1893, was a resident of Connelsville, a small town (population 80) eleven miles northwest of Kirksville, where he owned two small tracts of land. In late 1970 he sustained an injury to his head in an automobile accident, after which people noticed changes in his behavior. His wife died October 4, 1971, and he was left alone and without immediate family. He suffered from the loss of his wife and this contributed to his aberrational behavior, some of which threatened his personal and financial well-being. Concerned friends secured a medical evaluation which showed as of October 19, 1971, that he suffered from progressive and degenerative arteriosclerosis.

On October 26, 1971, Alfred Anderson executed the deeds in question purporting to convey one of his tracts to Opal P. Hen-

derson absolutely, and the other to Willie Pearl Wiyrick, reserving a life estate to himself. Upon learning of this transfer, Cleetus Wilson, a long-time friend of Mr. Anderson, instituted proceedings which resulted in a declaration on November 30, 1971, that Mr. Anderson was incompetent. Mr. Wilson was appointed guardian of the person and estate of Mr. Anderson December 15, 1971, and he commenced this action in equity January 3, 1972. Nova Foster succeeded Mr. Wilson.

As the successor guardian for Mr. Anderson, Nova Foster had known his ward for approximately eight years and was aware of his ownership of two tracts of land. The tract "south of the road" was Mr. Anderson's homesite; the other, north of the road, was occupied by Mrs. Henderson. Aside from contacts with Mr. Anderson over the years of acquaintance, Mr. Foster saw him frequently in October, 1971, as the result of Mrs. Anderson's demise and the attendant funeral services provided by him. As a result of his concern over Mr. Anderson's apparent incapacity, he assisted in seeking a medical examination, an adjudication of incompetency and an ultimate residence in a nursing facility. This concern grew not only from the association during the funeral period, but also from a trip by Mr. Anderson to Forest City, Iowa. He was approached in his home on October 13, 1971, by Adair County Sheriff Leon Coy, who said he had received a call from the Forest City Police Department advising of the need to dispatch someone to return Mr. Anderson to Missouri. Mr. Foster immediately sent his employee to make the journey to return Mr. Anderson. Upon returning and in the course of later contacts, Mr. Anderson denied that he had gone to Iowa and told Mr. Foster that he had been driven about for many hours via an ambulance from Kirksville Osteopathic Hospital. The purpose of this phantom trip, according to Mr. Anderson, was to create a large ambulance bill. Shortly after this incident, Mr. Anderson was declared incompetent and made a ward of the Probate Court in Adair County, Missouri. At the hearing Mr. Foster indicated an inability on the part of Mr. Anderson to recognize persons.

As a local osteopath engaged in general practice, Dr. Barry W. Gushleff was asked by Mr. Foster and Mr. Wilson to examine Mr. Anderson. The examination was made October 19 or 20, 1971, and consisted of a general physical. Doctor Gushleff talked with Mr. Anderson and noted general disorientation as to time, place, and identity. Mr. Anderson was unaware of the date or the year and was a generally confused person. He did relate that it was daylight and apparently could distinguish between night and day. Other than the subjective impressions formed, Doctor Gushleff noted that he manifested poor lower extremity circulation, accompanying thick toenails and a state of psychosis known as senile dementia. He characterized this condition technically as "senile dementia, cerebroarteriosclerosis, hardening of the arteries of the brain, or old folks' syndrome." He generalized the condition as a "slow, degenerating, rotting process." He conceded that this condition was a fluctuating condition with intermittent periods of exacerbation and remission during which persons who suffer from Mr. Anderson's condition "will appear to be lucid." Doctor Gushleff gave his opinion, based upon a reasonable medical certainty, that Mr. Anderson was incapable upon the date of examination to conduct his business or personal affairs and would not have been competent to convey his property on October 26, 1971. Doctor Gushleff noted also that Mr. Anderson referred to his wife as still living some two weeks after her death.

As his first guardian and long-time friend, Cleetus Wilson described dramatic and progressive deterioration of Mr. Anderson's mental capacities subsequent to the automobile accident in late 1970. Mr. Wilson related numerous incidents suggesting Mr. Anderson was having difficulty relating to reality. On repeated occasions, he inquired about his tax receipts, purchased unnecessary items, became confused in areas of locale long familiar, and luckily escaped serious injury from his cooking procedures. Mr. Anderson wrote checks on a bank just

shortly after he had transferred his funds to another community. As a friend and constant associate during October, 1971, Mr. Wilson described the sequence of events preceding the execution of the deeds in issue. Mildred Potter, the daughter of Mrs. Henderson who, in turn, was Mr. Anderson's deceased wife's sister, called Mr. Wilson in early October asking if he would take Mr. Anderson to a scrivener, Ollie Blackorby, an employee of the Bank of Kirksville. She further requested that Mr. Blackorby prepare two deeds, one to Mrs. Potter herself and another to Mrs. Henderson. The trip was made but, absent the descriptions, Mr. Blackorby did not prepare the deeds. While returning from this initial trip, Mr. Wilson cautioned Mr. Anderson about signing any documents. While acknowledging an alleged real estate sale by Mr. Anderson some weeks prior, Mr. Wilson stated unequivocally that Mr. Anderson's degeneration was not only worsening, but also obvious in the Fall of 1971. Whether as a result of those observations and daily conversations of the repeated denials of signing by Mr. Anderson, Mr. Wilson was of the opinion that capacity to execute deeds was lacking on October 26, 1971. This observation was reinforced by Mr. Anderson's total disorientation at the incompetency hearing.

Johnny Brown was the source of the "ambulance bill." He was commissioned to drive to Forest City, Iowa, where he first met Mr. Anderson. When he arrived at the police station, he noted that Mr. Anderson apparently did not know where he was. He returned Mr. Anderson and, on the following day, Mr. Anderson failed to recognize him. He also expressed his belief that Mr. Anderson during the Fall of 1971 lacked the ability to take care of his property.

Gerald True was a grocer in Connelsville and observed the changes in Mr. Anderson after his accident. He would return to his store and repeat a purchase indicating that his deceased wife had sent him for the additional duplicate items. In evaluating this course of observed behavior, Mr. True testified he did not believe Mr. Anderson to

be of sound mind on November 30, 1971, the date of his incompetency hearing.

Sheriff Leon Coy was instrumental in returning Mr. Anderson to Kirksville from his journey to Forest City, Iowa, and also in obtaining medical attention. He did the latter because he felt Mr. Anderson was incapable of driving his vehicle. During one of his visits, Mr. Anderson related his account of the late night "ambulance trip," and on another repeated an account of the death of his wife.

Mildred Potter, unrelated to Mr. Anderson, was a niece of Mr. Anderson's deceased wife, mother of one of the grantees, Willie Wiyrick, and the daughter of Mrs. Henderson, the other grantee. She testified generally to many services performed by herself, her son, and her mother for Mr. Anderson over the years, ranging from assistance with errands to providing needed companionship. Her mother, Mrs. Henderson, had resided for a number of years in a house located on property owned by the Andersons at a rental of $25 per month. According to Mrs. Potter, numerous discussions were had concerning this property; the desired application of the rental beyond normal lessor's return was not clearly stated. Although instrumental in obtaining assistance in preparing the two deeds, she recalled nothing about the date of the deeds. Apparently, she and her son took Mr. Anderson to Marian Hunt, an abstractor, for the deed preparation. This was subsequent to the effort to obtain the services of Mr. Blackorby. After Mrs. Hunt prepared the conveyances, two $1.00 bills were exchanged to the benefit of Mr. Anderson. Mrs. Potter paid $1.00 as agent for her mother, and Mr. Wiyrick paid $1.00 for his property. Mr. Anderson signed the deeds in Mrs. Potter's presence and then while he waited in the car with his nephew by marriage, the deeds were taken to the recorder's office. These events occurred on October 26, 1971, in Kirksville. She further related that during the process Mr. Anderson stated that he desired to deed one tract to Mrs. Henderson because she had paid rent equivalent to a purchase price in fur-

therance of some sort of arrangement. Insofar as his homesite was concerned, he indicated that he hated to see someone take it away so he would give it away to Mr. Wiyrick and retain a life estate. This reservation was in response, according to Mrs. Potter, to advice given by Marian Hunt. Subsequent to the deeds' preparation, Mr. Anderson, according to the observations of his niece by marriage, kept his house clean and generally cared adequately for his needs. He was forgetful at times, but his reported bizarre behavior was not, in her opinion, more indicative of incompetency than any other person's behavior. She further attributed any unusual behavior to grief over his wife's death. He was, in her opinion, capable of managing his own affairs at the time of the deed execution. She had suggested he reside with her in her own home. After his placement in the nursing home, Mrs. Potter stated she did not visit him because she was afraid he would want to come home with her. She did, however, call once to see about his status.

Marian Hunt, as the abstractor and scrivener who prepared the deeds, testified to an acquaintance with Mr. Anderson for several years. According to her recollection of the events of October 26, 1971, Mr. Anderson in the company of some other persons requested the preparation of some deeds. He assisted her in determining the exact description of the tracts in question. She recalled the exchange of some checks and believed monies amounting to $400 or $500 moved. There is some suggestion that this may have been incident to an earlier transaction.

Willie Wiyrick assisted Mr. Anderson around his home on occasion. He is related to Mr. Anderson by marriage and is the grandson of Mrs. Henderson. He accompanied Mr. Anderson and Mrs. Potter on the second occasion the deeds were sought. He did so in response to Mr. Anderson's telling him of hearing about someone's efforts at taking his farm. When asked about the source of his fear, Mr. Anderson could not remember who was trying to take his land but did offer a solution. He would deed it to Mr. Wiyrick for safekeeping. Mr. Wiyrick did not suggest any reservation.

Appellant asserts that the foregoing shows a "sharp conflict in the evidence on the issue of mental capacity." The trial court resolved the conflict; and on this review, "upon both the law and the evidence * * * [d]ue regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.01.3(a)(b), V.A.M.R.

■ Close friends of Mr. Anderson, Nova Foster and Cleetus Wilson, described his capacities and actions as they existed in the Fall of 1971, and were of the opinion that he was incompetent to execute deeds on October 26, 1971. These observations were reinforced by the observations of Mr. Brown who made the trip to Iowa to return Mr. Anderson to Missouri, and by his grocer, Mr. True. Although conflicting in many respects, to a lesser extent Mr. Anderson's aberrational behavior was confirmed by defendant Willie Pearl Wiyrick and by Mildred Potter, daughter of defendant Opal P. Henderson. Testimony from family, social, and business relations with an opportunity to observe conduct, habits, and mental peculiarities is entitled to great weight. *Holton v. Cochran*, 208 Mo. 314, 106 S.W. 1035, 1066 (1907). Such opinions and observations were confirmed expertly by Doctor Gushleff who gave his opinion that Mr. Anderson was not competent to convey his property on October 26, 1971, the date upon which the deeds were purportedly executed. The expert's opinion was in turn confirmed by the probate court by its declaration on November 30, 1971, that Mr. Anderson was an incompetent and in need of a guardian for his person and property.

Such evidence is sufficient to satisfy the burden of showing that A. A. Anderson, on October 26, 1971, lacked mental capacity to execute the deeds in question. For a similar case, see *Gruetzmacher v. Hainey*, 373 S.W.2d 45 (Mo.1963) and cf. *Webb v. Heddleson*, supra, where the court was not compelled to set aside deeds because there was

no proof of lack of capacity on the date they were executed.

Appellants rely on *Cruwell v. Vaughn*, supra, where a judgment setting aside deeds was reversed. It differs, however, in that the grantor, Andrew Cruwell, discussed the transaction with the scrivener, an attorney he had known for 15 years, and the evidence concerning the grantor's condition on the day the deeds were executed indicated he fully understood the transaction and was of sound mind at the time. *Peterein v. Peterein*, 408 S.W.2d 809, 814 (Mo.1966).

Judgment affirmed.

All concur.