Ersie C. HARRIS, Plaintiff/Appellant,

v.

James M. LYNCH, Frances M. Lynch, Orval Dewayne Davis, Nancy G. Davis, J. Kurtis Wahlbrink, Mary A. Mabry, C. Michael Roth, Dennis Poertner, Jan M. Poertner, Jack E. Mulligan, Defendants/Respondents.

No. 69773.

Missouri Court of Appeals, Eastern District, Division Two.

March 4, 1997.

Kurt A. Hentz, St. Louis, for plaintiff/appellant.

David L. Baylard, Christopher W. Jensen, Briegel Baylard, P.C., Union, for defendants/respondents.

CRANE, Presiding Judge.

Plaintiff appeals from that portion of the trial court's judgment denying her adverse possession claim to a strip of land lying between her southern property line as shown on her deeds and a fence line further south which runs across defendants' lots. The trial court's judgment was supported by substantial evidence and did not misdeclare or misapply the law. We affirm.

At the time this action was filed in 1989, plaintiff owned two adjoining tracts of land, a 28 acre tract and an 80 acre tract, in Franklin County, Missouri. The 80 acre tract is west of the 28 acre tract. Record title to both tracts shows a 1/4 section line as the southern boundary to each tract (hereinafter "the boundary line"). The 80 acre tract consists of the northeast quarter of the northwest quarter and the northwest quarter of the northeast quarter of Section 24. The 28 acre tract is part of the northeast quarter of the northeast quarter of Section 24. Defendants have record title to individual lots on

the south side of the boundary line in the southeast and southwest quarters of the northeast quarter of Section 24 and the southeast quarter of the northwest quarter of Section 24.[1] A roadway easement provides access to plaintiff's 80 acre tract from the south, about three quarters of the distance east of the western boundary.

A fence (hereinafter "the fence"), which does not run in a straight line, lies between 29 1/2 feet and 43 feet south of the boundary line. As diagramed at trial, the fence begins on defendants' western boundary at point A, continues east to point D at the roadway easement, continues east to point E (which lies slightly to the south and west of the corner at the boundary line where the 80 acre and 28 acre tracts meet) and continues to Bassett Road at point G, defendants' eastern boundary. At one point the fence juts north 19 feet to go around a cemetery. At another point it juts south 28 feet at a fairly deep ravine then juts northeast again. Further east it juts north again eleven feet and crosses a creek. Eighty percent of the fence posts are in woods. The western stretch of the fence is attached to trees; in the middle it is attached to a combination of trees and posts; the eastern stretch is attached to posts. Exhibits and testimony at trial indicated the fence area to be heavily wooded with a clearing around the roadway easement.

Richard Winkler purchased the 80 acre tract in 1962. At the time of purchase, he did not have the property surveyed and a large segment of the fence from point A to point D was in existence. At that time Mrs. Clark was his neighbor to the south and Mr. Alt was his neighbor to the east. Mr. Winkler assumed the fence had been built by one of Mrs. Clark's husbands. Much of the fence was overgrown with trees. In 1963 Mr. Winkler extended the fence from point D to point E, with a gate across the roadway easement so that he could put cattle on the property. Mr. Winkler thought, based on conversations with Mr. Alt, that point E was the corner between his property and Mr.

Alt's property to the east. Mr. Winkler testified that, in erecting that segment of fence and in maintaining the fence, he did not intend to take property away from any of his neighbors. Later Mr. Winkler had horses on the property which were allowed to range freely. He maintained the fence which he used as a barrier to contain the cattle and the horses.

After Mrs. Clark, Mr. Kahlmeyer owned or occupied the property to the south. Mr. Winkler saw Mr. Kahlmeyer build that segment of the fence from point E east to the road several years prior to Mr. Kahlmeyer's death in 1976. He testified that Mr. Kahlmeyer also maintained the fence. Mr. Winkler never discussed the boundary line with Mrs. Clark or Mr. Kahlmeyer. After Mr. Kahlmeyer's death, Carol Kahlmeyer, as trustee, held the property to the south under a 1977 indenture of trust.

The 28 acre tract was owned by Mr. Alt and then by Shirley Flesher. Plaintiff and her former husband purchased the 28 acre tract from Shirley Flesher in the fall of 1977. Plaintiff received it by quit claim deed from her former husband in 1978. Plaintiff purchased the 80 acre tract from Richard Winkler in 1984. At the times she purchased these properties, she did not have them surveyed.

When plaintiff purchased the 28 acre tract in 1977, Ms. Flesher told plaintiff that she had put a new fence on the western property line to conform to a survey. They did not discuss the fence to the south. Plaintiff assumed that, because there was no new fence to the south, the existing fence (which had been built by Mr. Kahlmeyer) was on the property line.

When plaintiff purchased the 80 acre tract from Mr. Winkler, she assumed the fence was on the property line but did not recall discussing that with him. Neither the deed from Mr. Winkler nor the deed from Ms. Flesher mentioned the fence or points in the fence as a boundary.

---

1. For convenience, unless an individual lot owner's conduct or testimony is pertinent, we will refer to one or more defendants collectively as "defendants" and will not distinguish individual lot owners or individual lots.

While plaintiff owned the above properties, she allowed her horses to graze on the land and used the fence to contain the horses. She also had cattle for a portion of this time. Plaintiff relied on her husband and her tenants to maintain the fence, however, she did not remember when they last repaired it. Plaintiff observed that the fence was very old because trees had grown into the fence.

The fence was predominantly attached to the south side of the trees and posts. A surveyor testified that this indicated that it had been put up by someone standing on the south. The fence post on the western corner was braced to the east and south, again indicating it was put up from the south.

In 1986 defendant Jack Mulligan bought the property to the south of the boundary line from Carol Kahlmeyer, trustee, so he could develop a subdivision. When he bought the property, the fence in the gate area was in good shape but much of the rest of the fence was on the ground. There were numerous cross fences going north and south. He subdivided the area into 14 lots and sold them. The fence crosses lots 1 through 6. The owner of lot 4 testified that he, not plaintiff, had maintained the fence since he lived there in order to keep plaintiff's horses out. In 1989 Mr. Mulligan tore down the fence in the gate area at the request of the owners of lots 2 and 3 in order to move the fence back to the boundary line.

On November 7, 1989, plaintiff filed a petition to quiet title and for injunctive relief. Defendants filed a counterclaim for a declaratory judgment, quiet title, and ejectment. After a bench trial, the trial court entered judgment in defendants' favor on the petition and on these counts of the counterclaim.[2] The court made the specific finding that "the fact that horses were allowed to run is insufficient possession and use to establish Plaintiff's claim for adverse possession."

On review of a court-tried case, we sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Pinnell v. Jacobs,* 873 S.W.2d 925, 927 (Mo.App.1994). We defer to the factual findings of the trial judge, who is in a superior position to assess credibility. *Id.*

To prevail on a claim of adverse possession, a plaintiff must prove by a preponderance of the evidence each and every element of adverse possession: that the possession was (1) hostile and under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous for a period of ten years. *Teson v. Vasquez,* 561 S.W.2d 119, 125 (Mo.App.1977); *Cunningham v. Hughes,* 889 S.W.2d 864, 866–67 (Mo.App. 1994). Failure to prove any one of these elements defeats the claim. *Teson,* 561 S.W.2d at 126.

Because every piece of property is unique, each adverse possession case must be decided in light of its own unique circumstances. *Id.* at 125. Much depends on the location, the character, and the use to which the land in question may reasonably be put. *Id.* Those specific manifestations of possession and ownership exhibited by a claimant which would support a finding of title by adverse possession in a populous and highly developed area are not the same as those which would support such a finding where the property is sparsely populated farmland. *Id.*

In this case the trial court found that plaintiff failed to establish actual possession. Where a claimant occupies land without color of title, in order to prevail, the claimant must show physical possession of the entire area claimed. *Id.* at 126. A mere mental enclosure of land does not constitute the requisite actual possession. *Id.* Rather, there must be continual acts of occupying, clearing, cultivating, pasturing, erecting fences or other improvements and paying taxes on the land. *Id.* The performance of

---

2. Defendants also sought in a fourth count to compel plaintiff to pay maintenance fees on the subdivision road accessing her property. The trial court denied this relief. No appeal has been taken therefrom.

all or any combination of these acts of occupancy serves as evidence of actual possession but is not conclusive. *Id.* Each case must be decided on its own peculiar facts. *Id.*

■ Plaintiff claims that her predecessor Mr. Winkler took the property south of the boundary line of the 80 acre tract by adverse possession in 1973 and that she took the property south of the boundary line of the 28 acre tract by adverse possession on April 2, 1986. Plaintiff relies on the following evidence to establish her claim of adverse possession: 1) that Mr. Winkler added to the existing southern fence to contain his cattle, 2) that he anchored that fence to a post that Mr. Alt said was the corner between the 80 acre tract and Mr. Alt's 28 acre tract, 3) that Mr. Winkler maintained the southern fence and grazed cattle thereon, 4) that after purchasing the 28 acre tract and the 80 acre tract, plaintiff used the southern fence to contain her cattle, that she grazed her cattle and horses on the property, and 5) that her husband and tenants maintained the fence.

Under the circumstances of this case, these facts do not constitute adverse possession. The evidence established that most of the fence had been built by defendants' predecessors. Mr. Winkler observed defendants' predecessor, Mr. Kahlmeyer, build the segment to the south of the 28 acre tract and he assumed a husband of defendants' predecessor, Mrs. Clark, had built the segment to the south of the 80 acre tract. The surveyor testified that the fence had been constructed on the south side because the wires and braces were on the south side of the posts and trees. Defendants' predecessors did not give up title by not placing the fence on their boundary line.

Of course, a landowner who puts his fence inside his boundary line does not thereby lose title to the strip on the other side. That loss would occur only if his neighbor should take possession of the strip and hold it for the requisite period of years.

*Brown Paper Mill Co. v. Warnix,* 222 Ark. 417, 259 S.W.2d 495, 495 (1953). The Missouri Court of Appeals cited this case with favor in *Dambach v. James,* 587 S.W.2d 640, 643 (Mo.App.1979). In *Dambach* the court

held that the mere location of a fence, by a party with record title, in the absence of an agreement that it establishes a boundary line, does not establish the boundary line since a fence may be placed for other purposes. *Id.*

Mr. Winkler did extend the fence with a small segment in order to contain his cattle. He testified that in erecting that segment he did not intend to take property away from any of his neighbors. He anchored the fence where plaintiff's predecessor to the 28 acre tract told him was a corner post. Mr. Winkler's expressed intention to not take property from his neighbors does not by itself defeat a claim of adverse possession.

"If the possessor occupies the land in question intending to occupy that particular piece as his own, his occupancy is adverse. It is not necessary that he intend to take away from the true owner something which he knows belongs to another, or even that he be indifferent as to the facts of the legal title. It is the intent to possess, and not the intent to take irrespective of his right, which governs."

*Miller v. Warner,* 433 S.W.2d 259, 263 (Mo. 1968) quoting *State ex rel. Edie v. Shain,* 348 Mo. 119, 152 S.W.2d 174, 176–77 (1941). However, he did not testify that he made any use of the land other than to allow his cattle and horses to have access to it and be contained by the existing fence. He did not testify that he cleared the land, cultivated it, mowed it, or otherwise managed it as pasture land.

Although each case must be decided on its own facts, it has been generally held that maintenance of a non-boundary fence and allowing cattle to have access to undeveloped land, while evidence of possession, are not sufficient in themselves to establish adverse possession. *See Cunningham,* 889 S.W.2d at 867 (allowing cattle to graze on a strip of undeveloped land, repairing a fence constructed by a predecessor, and giving permission to others to hunt and cut wood on the property was insufficient to establish title by adverse possession); *Dambach,* 587 S.W.2d at 643 (pasturing livestock on rough, uncleared land contained by a nonboundary fence built by record title holders' predeces-

sors is insufficient in itself to establish adverse use); *Edmonds v. Thurman*, 808 S.W.2d 408, 411 (Mo.App.1991) (plaintiff's maintenance of old fence on defendant's property constructed by defendant's predecessor standing alone is insufficient to establish adverse possession).

Where a party claims rural land, courts have required activities additional to those in the above cases to establish adverse possession. Thus, in *Miller*, 433 S.W.2d 259, plaintiffs, who claimed title by adverse possession of a strip of land north of an east-west fence, cleared the land of brush and trees, raised alfalfa on it, pastured cattle on it, cultivated it up to the fence, and raised a bean crop on it. The court recognized that although pasturing cattle or cutting timber do not in themselves establish adverse possession, they tend to show a claim of ownership which, when combined with plaintiff's acts of clearing, cultivating, and raising crops, established actual possession. *Id.* at 264.

Likewise, in Whiteside v. Rottger, 913 S.W.2d 114 (Mo.App.1995) the court found adverse possession where additional acts of possession were established. In *Whiteside* plaintiff and his family possessed an 18 acre strip of property for over 90 years. During that time the family farmed, fenced, pastured and raised cattle, built a well, hunted, fished, and cut down trees on the parcel. The family also entered into an agreement with the local drainage district to clean a drainage ditch that ran across the land. *See also* Forester v. Whitelock, 850 S.W.2d 427, 429 (Mo.App.1993) (defendants established a claim of adverse possession of land to a nonboundary fence where defendants had occupied, cleared, cultivated, pastured, erected fences, and built a levee on the disputed area).

The evidence does not show that plaintiff or her predecessors did any more than allow their cattle and horses to have access to the unfenced portion of defendants' mostly wooded land, extended a portion of the fence built by defendants' predecessors, and provided some maintenance of the fence. There was no evidence that plaintiff or her predecessors engaged in any other acts of possession such as clearing the disputed land, cultivating it,

managing it for pasture, or building any other structures on it. The evidence before the trial court was insufficient to establish adverse possession.

The judgment of the trial court is affirmed.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.