Edward LEE, Personal Representative of the Estate of Pauline Elizabeth Lee, and Lois England, Public Administrator, as Guardian and Conservator of the Estate of Wesley Marvin Lee and Bobby Lee, Plaintiffs–Respondents,

v.

Sherman HILER and Connie Hiler, Defendants–Appellants.

No. 25635.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 31, 2004.

Steven Privette, Willow Springs, MO, for appellants.

Jacob Y. Garrett, West Plains, MO, for respondents.

JEFFREY W. BATES, Judge.

Sherman and Connie Hiler (referred to collectively as "the Hilers" and individually as "Sherman" and "Connie") appeal from a judgment setting aside a warranty deed executed by Pauline Lee ("Pauline") and her two sons, George Robert Lee ("Bobby") and Wesley Marvin Lee ("Wesley"). This warranty deed conveyed a 360–acre farm valued at $288,000 to the Hilers, who paid nothing for the property other than

the expense of preparing the deed and the cost of a meal for the Lees. The trial court concluded the deed was void because all three grantors who signed this instrument were mentally incompetent and unable to understand the nature, scope and consequences of what they were doing. The Hilers appeal, claiming the judgment setting aside the deed is not supported by substantial evidence and is against the weight of the evidence. We affirm.

## I. Standard of Review

 In this court-tried case, our review is governed by Rule 84.13(d).[1] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Ridgway v. TTnT Development Corp.*, 126 S.W.3d 807, 812 (Mo.App.2004).[2] A judgment is presumed correct, and the appellant has the burden of proving it erroneous. *Wingate v. Griffin*, 610 S.W.2d 417, 419 (Mo.App.1980). We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Arndt v. Beardsley*, 102 S.W.3d 572, 574 (Mo.App.2003). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Keller v. Friendly Ford, Inc.*, 782 S.W.2d 170, 173 (Mo.App.1990). We defer to the trial judge's superior opportunity to assess the witnesses' credibility. *Harris v. Lynch*, 940 S.W.2d 42, 45 (Mo.App.1997). Our summary of the evidence presented at trial, which is set forth below, has been

prepared in accordance with these principles.

## II. Facts and Procedural History

The 360–acre property at issue was purchased by Pauline and her husband, Frank Lee ("Frank"), in 1969. Frank was a farmer, and Pauline was a housewife with an eighth-grade education. They moved onto the farm with two of their children, Bobby and Wesley. These two boys were then 13 and 11 years old, respectively. Another older son, Ed Lee ("Ed"), had already left home to attend college.

Bobby and Wesley, who were described by brother Ed as being "slow," continued to live on the farm with their parents even after they became adults. Neither ever held a job or was able to take care of himself without assistance. Wesley had trouble with his vision and could barely read. Bobby could read somewhat better, but he was not able to understand written material dealing with subjects beyond middle school level. Bobby never learned to operate an automobile because he was terrified of driving. Wesley did learn to drive much later in life. He obtained a driver's license in 2001, but his driving skills were poor. On one occasion, he drove his pickup into the ditch and had to have it towed away. On another occasion, he rear-ended a road grader.

Both Wesley and Bobby had a child-like trust in other people and could be easily manipulated to part with their money or property. Numerous examples of their lack of ability in this regard were presented. During a two-year span, Wesley traded trucks with one used-car dealership

---

1. All references to rules are to the Missouri Rules of Civil Procedure (2004).

2. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule

were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

seven different times. The trade-ins and purchases stopped only when Wesley ran out of money. Wesley also cut the firewood used to heat the farmhouse. If his chainsaw would not start or the chain got dull, he would simply buy a new one. At one point, he owned eight different chainsaws. A person cutting logs on the farm once talked Wesley and Bobby into giving him a one-year-old garden tiller and a .22 rifle, both of which were later located in a pawnshop.

In 1995, Pauline's mental status began to decline after she suffered a stroke. In 1997, she fell and broke her hip. While hospitalized, she was diagnosed as having vascular dementia. That same year, Frank died. Pauline's mental status declined even further after her husband died. These changes were observed both by her son, Ed, and her treating physician, Dr. John Roberts ("Dr. Roberts").

Ed testified that after Frank's death, Pauline began exhibiting periods of confusion during their conversations. These periods of confusion became more frequent and worsened in character as time progressed. Ed's relationship with his mother, which had been good before Frank's death, deteriorated significantly. On one visit, Pauline would be fine. The next time Ed came to see his mother, she would call the sheriff simply because Ed was there and she did not want him on her property. On one occasion, Pauline even threatened to kill Ed because she was convinced he and his elderly uncle (a stroke victim in his late 50's) had engaged in a drug party in Pauline's driveway.

Dr. Roberts was Pauline's family doctor from 1991 until she died in November 2000. Dr. Roberts testified that he first observed changes in Pauline's mental status after her first stroke in 1995. This deterioration became more evident after her husband died in 1997. A 1999 CT scan revealed that Pauline had suffered at least three additional strokes after her first one in 1995. Between January 1997 and November 2000, Dr. Roberts saw Pauline over 30 times. During a number of these office visits, Dr. Roberts told Pauline she needed to have a guardian appointed to manage her financial affairs. In June 1999, Pauline was developing kidney failure. During an office visit with Dr. Roberts, he and Pauline discussed the fact that she needed someone to help her make decisions. In August of 1999, Pauline had another office visit with Dr. Roberts. They again discussed Pauline's need for someone to help her make decisions. During this office visit, Dr. Roberts had an extended discussion with Pauline concerning a hospital bill she had received for care provided to her late husband. Despite repeated efforts, Dr. Roberts could not get Pauline to understand why she still needed to pay the bill even though Frank was deceased. Pauline became very upset about the matter, which was unusual for her. This caused Dr. Roberts to be concerned about her mental condition. During an office visit on November 17, 1999, Dr. Roberts' office note stated that he "[t]alked with patient at some length that she needed to have a guardian or somebody help her with her financial affairs. Patient relates that she will think about this." Based on Dr. Roberts' clinical judgment, he diagnosed Pauline as having multi-infarct dementia, which is a medical term used to describe the loss of cognitive function in a person who has had several strokes. It was Dr. Roberts' medical opinion, expressed to a reasonable degree of medical certainty, that Pauline lacked the ability to make informed decisions between August 10, 1999, and November 17, 1999, due to mental impairment caused by her series of strokes.

Dr. Roberts' reference in his testimony to the August 1999 through November 1999 time frame is significant because the farm was conveyed to the Hilers in October 1999. The Lee family first became acquainted with the Hilers in the 1960's because they ran the local funeral home. Sherman also hunted on the Lee's farm. After Frank's death, title to the farm was held by Pauline, Wesley and Bobby as joint tenants with a right of survivorship. On October 5, 1999, the Hilers drove Pauline, Wesley and Bobby to a title company in Houston, Missouri. A general warranty deed was prepared which conveyed title to the farm from Pauline, Wesley and Bobby to the Hilers. Each grantor signed the deed. The Hilers paid nothing for the farm, other than the expenses of preparing the deed and buying lunch for the Lees afterwards. Sherman testified that Pauline told him this was good enough. At the time, the farm was worth $288,000.

On December 3, 1999, Ed filed a petition to set aside the deed in the Circuit Court of Texas County, Missouri. In January 2000, Ed filed a petition in the probate division of the same court asking that Pauline be declared incompetent. On February 3, 2000, the petition was granted, and Pauline was declared disabled and incapacitated. Ed and Marie Bell were appointed as Pauline's co-guardians and co-conservators and substituted as plaintiffs in the lawsuit. Ed discussed the real estate transaction with Pauline many times. She appeared confused about what she had done and denied signing any papers transferring ownership of the farm to the Hilers.

In July 2000, Wesley and Bobby also were adjudicated to be incompetent by the probate division of the Texas County Circuit Court. Texas County Public Administrator Lois England ("England") was appointed as their guardian and conservator. At the same time, she took over as Pauline's guardian and conservator, replacing Ed and Marie Bell. As soon as England was appointed, she met with Pauline at the farm. During the meeting, Pauline was very concerned because she had mistakenly conveyed the entire farm to the Hilers. Pauline said she only intended to deed 10 to 40 acres of "junk land" to the Hilers so Sherman would have a place to hunt. At the time she signed the deed, she was confused about what was being conveyed. Pauline made England promise to do everything possible to set the deed aside because it was not Pauline's intention to give the Hilers the entire farm. In December 2000, Lois England was substituted as the plaintiff in the lawsuit.[3]

The case was tried in April 2003. Plaintiffs' evidence, that Pauline, Wesley and Bobby lacked the requisite mental capacity to execute the warranty deed conveying the farm to the Hilers, came primarily from the testimony of Ed, Dr. Roberts and England, which is summarized above. Defendants' contrary evidence that all three grantors had the necessary mental capacity to execute the deed came from defendants and their expert witness physician, Dr. Franklin Smith. Sherman testified he initially resisted Pauline's efforts to deed the farm to him and his wife. He only agreed to do so after repeated requests by Pauline and only so he could help Wesley and Bobby by making it possible for them to continue living on the farm. The Hilers testified all three grantors appeared to know what they were doing when they signed the deed. Dr. Smith testified that Pauline did not have dementia when she signed the deed.

3. After Pauline died in November 2000, Ed was appointed as personal representative of her estate and rejoined the lawsuit as a plaintiff in that representative capacity.

After hearing the evidence, the trial court found by clear, cogent and convincing evidence that Pauline, Wesley and Bobby were incompetent on October 5, 1999, and were unable to understand the nature, scope and consequences of signing the warranty deed which transferred ownership of the farm to the Hilers. Therefore, the deed to the Hilers was void and conveyed to them no interest whatsoever in the farm. The judgment set aside the deed and determined that, since Pauline was dead, Wesley and Bobby owned the farm in fee simple absolute as joint tenants with right of survivorship. This appeal followed.

### III. Discussion and Decision

 A suit to have a deed declared void invokes the most extraordinary power of equity. *Gregg v. Georgacopoulos,* 990 S.W.2d 120, 123 (Mo.App.1999). Consequently, a party seeking cancellation of a deed bears the burden of establishing by clear, cogent, and convincing evidence the basis for exercising such power. *Blackburn v. Spence,* 384 S.W.2d 535, 539 (Mo. 1964); *Ruestman v. Ruestman,* 111 S.W.3d 464, 483 (Mo.App.2003). The evidentiary burden imposed by the clear, cogent and convincing standard of proof was explained by our Supreme Court in *Grissum v. Reesman,* 505 S.W.2d 81 (Mo.1974):

> The term frequently used in equity cases, with reference to the required degree of proof, is "clear, cogent and convincing" evidence. The courts have seldom stopped to analyze that term. As we now construe the phrase, it really means that the court should be clearly convinced of the affirmative of the proposition to be proved. This does not mean

that there may not be contrary evidence. The word "cogent" adds little, if anything; it means impelling, appealing to one's reason, or convincing.

*Id.* at 85–86; *see also Robertson v. Robertson,* 15 S.W.3d 407, 415 (Mo.App.2000).

 Where, as here, the basis for setting aside a deed is the grantor's alleged lack of mental capacity, "[t]he burden is on the person seeking to set aside the deed to establish the grantor lacked mental capacity *at the time of the deed's execution.*" *Thurmon v. Ludy,* 914 S.W.2d 32, 34 (Mo. App.1995) (emphasis in original); *see McCoy v. McCoy,* 360 Mo. 199, 227 S.W.2d 698, 703 (1950). The grantor's mental capacity on the date of execution may be demonstrated by evidence of the grantor's condition before and after the execution. *Gifford v. Geosling,* 951 S.W.2d 641, 644 (Mo.App.1997); *Estate of Helmich v. O'Toole,* 731 S.W.2d 474, 478 (Mo.App. 1987).

In the Hilers' single point relied on, they contend the trial court's judgment, that Pauline, Wesley and Bobby were incompetent when they executed the deed, is not supported by the evidence and is against the weight of the evidence. We consider each argument in turn.

### A. Sufficiency of the Evidence

 The Hilers argue the evidence was insufficient because there was no foundation for Dr. Roberts' opinion that Pauline was unable to make an informed decision when she executed the warranty deed.[4] Lack of foundation for an expert's opinion is an attack on its admissibility. *Washington by Washington v. Barnes*

---

4. In the Hilers' point relied on, they appear to challenge the trial court's finding that Wesley and Bobby lacked the mental capacity to execute the warranty deed. The argument section of the Hilers' brief, however, contains no discussion of this issue. By failing to develop this assertion of error in their argument, the Hilers have abandoned the issue. *See Jansen v. Westrich,* 95 S.W.3d 214, 218 (Mo.App. 2003).

*Hosp.,* 897 S.W.2d 611, 615–16 (Mo. banc 1995). Since the Hilers did not challenge the adequacy of the foundation for Dr. Roberts' testimony at trial, this potential objection was waived. *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 209 (Mo. banc 1991). Therefore, we must consider Dr. Roberts' testimony in deciding the sufficiency of the evidence to support the judgment:

> The distinction between the admissibility of an expert's opinion testimony and the submissibility of a plaintiff's case in reliance thereon was discussed previously in *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 860[4] (Mo. banc 1993). If a question exists as to whether the proffered opinion testimony of an expert is supported by a sufficient factual or scientific foundation, the question is one of admissibility. It must be raised by a timely objection or motion to strike. Once opinion testimony has been admitted, as any other evidence, it may be relied upon for purposes of determining the submissibility of the case.

*Washington,* 897 S.W.2d at 616.

Dr. Roberts testified that he observed a decline in Pauline's mental status after she suffered a stroke in 1995. The changes in her mental status became more severe after Frank died in 1997. There was objective medical evidence from a 1999 CT scan that Pauline had suffered at least three additional strokes after her first one in 1995. Because of this series of strokes, Dr. Roberts diagnosed Pauline as having multi-infarct dementia. Prior to executing the warranty deed, Pauline had been advised by Dr. Roberts a number of times that she needed to have a guardian appointed to manage her financial affairs. Dr. Roberts presented unequivocal testimony at trial that Pauline lacked the mental capacity to make an informed decision about what she was doing on October 5,

1999, when she executed the warranty deed conveying the farm to the Hilers. His opinion was confirmed by the determination of the probate court, issued only four months after the deed was executed, that Pauline needed a guardian for her person and a conservator for her property because she was disabled and incapacitated. *See Foster v. Henderson,* 538 S.W.2d 910, 913 (Mo.App.1976).

■ Dr. Roberts' testimony was corroborated by the testimony of Ed and England. "Testimony from family, social and business relations with an opportunity to observe conduct, habits and mental peculiarities is entitled to great weight." *Spaunhorst v. Spaunhorst,* 650 S.W.2d 650, 654 (Mo.App.1983). Ed testified that his mother began to experience bouts of confusion in 1997 that became more frequent and severe over time. His relationship with his mother deteriorated significantly, culminating in a threat by Pauline to kill Ed because she suffered from the delusion that he and his disabled, elderly uncle had been using drugs in Pauline's driveway. After Ed became Pauline's conservator, he discussed the real estate transaction with Pauline many times. She appeared confused about what had occurred and always denied signing the deed. England presented similar testimony. During a meeting with England, Pauline said she had mistakenly conveyed the entire farm to the Hilers when she only intended to deed 10 to 40 acres of "junk land" to the Hilers so Sherman would have a place to hunt. Pauline was confused about what was being conveyed at the time she signed the deed.

Taken together, this evidence was sufficient to meet the clear, cogent and convincing evidence standard of proof that on October 5, 1999, Pauline was incompetent and was unable to understand the nature, scope and consequences of signing the

warranty deed. *See Gifford v. Geosling,* 951 S.W.2d 641, 644 (Mo.App.1997); *Estate of Helmich,* 731 S.W.2d at 478; *Spaunhorst,* 650 S.W.2d at 654.

### B. Weight of the Evidence

 We also conclude that the trial court's judgment is not against the weight of the evidence. In reviewing a court-tried case, an appellate court should exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and a firm belief that it was wrong. *Rathbun v. CATO Corp.,* 93 S.W.3d 771, 784 (Mo.App.2002). The phrase "weight of the evidence" means its weight in probative value, not the quantity or amount of evidence. *Id.* The Hilers' evidence concerning the grantors' mental capacity came from themselves and their expert, Dr. Smith.

 With respect to the Hilers' testimony, it is sufficient to note that they were the grantees of the deed and were, therefore, interested witnesses. It was up to the trial court to determine whether their involvement in the transaction was motivated by altruism or avarice. We will not substitute our judgment for that of the trial court on credibility issues. *See Miller v. Secura Ins. and Mut. Co. of Wis.,* 53 S.W.3d 152, 159 (Mo.App.2001). An appellate court "defers to the trial court on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record." *In re Adoption of W.B.L.,* 681 S.W.2d 452, 455 (Mo. banc 1984).

The same holds true for Dr. Smith's testimony. Although he testified Pauline was competent when she executed the deed, Dr. Smith's opinion was based on only two factors: (1) at that time, Pauline had not been diagnosed as having dementia; and (2) Dr. Smith was personally acquainted with Pauline and knew her to be a very intelligent and competent woman. The trial court reasonably could have disbelieved Dr. Smith's testimony for two reasons.

First, unlike Dr. Roberts, Dr. Smith was not one of Pauline's treating physicians. Dr. Smith's knowledge of any medical conditions that could affect Pauline's mental capacity came solely from a review of medical records obtained from four of her physicians. Dr. Smith's opinion that Pauline was not suffering from dementia on October 5, 1999, was based on the absence of that diagnosis from the records he reviewed. However, Dr. Roberts testified that Pauline's medical records from her 1997 hospitalization for a hip fracture did contain a diagnosis of vascular dementia. Dr. Smith was unaware of this fact because he had not been provided with these hospital records to review.

Second, Dr. Smith based his opinion in substantial part on his personal knowledge of, and interactions with, a different person whom he mistakenly believed to be the Pauline Lee who executed the warranty deed.[5] The trial court had the right to rely upon these facts in choosing to disregard Dr. Smith's opinion concerning Pauline's competency. *See Estate of Helmich,* 731 S.W.2d at 478.

---

5. The testimony at trial established that there were two women named Pauline Lee who lived in the same community. The Pauline Lee who married Frank and bore Ed, Wesley and Bobby was a housewife with an eighth-grade education. The other Pauline Lee was a school teacher who taught at Willow Springs. It was this latter Pauline Lee to whom Dr. Smith referred in his testimony.

The judgment of the trial court is supported by sufficient evidence and is not against the weight of the evidence. Therefore, we affirm.

PARRISH and SHRUM, JJ., concur.